UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RBS INVESTMENTS, LLC,

      Plaintiff,

v.

PROACT, INC.,

      Defendant.

Case No. 23-cv-12176

Honorable Robert J. White

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case exemplifies the pitfalls parties may encounter when they do not write down the terms of their agreements. Plaintiff RBS Investments LLC, d/b/a Scout Rx Pharmacy Benefit Consultants (Scout) brought this action against Defendant ProAct, Inc. (ProAct) after ProAct terminated the parties' business relationship. Scout asserted claims for: (1) breach of contract; (2) quantum meruit/unjust enrichment; (3) equitable estoppel; (4) promissory estoppel; (5) fraudulent misrepresentation; and (6) fraud in the inducement. (ECF No. 1-2, PageID.23–30). Scout also asked the Court to enter declaratory judgment and to issue an injunction against ProAct. (*Id.* at PageID.30–32). ProAct brought

counterclaims for (1) breach of contract; (2) promissory estoppel; (3) unjust enrichment; and (4) fraud in the inducement. (ECF No. 10, PageID.164–70).

Before the Court is ProAct's motion for summary judgment on all of Scout's claims. (ECF No. 21).   Neither party moved for summary judgment on ProAct's counterclaims.   At the heart of the parties' present dispute is whether ProAct owes Scout anything for its unilateral termination of the agreement, despite the absence of a written contract governing such terms.   The parties fully briefed the motion, and the Court held oral argument.   As explained below, the Court will grant in part and deny in part the motion.

## I.   Background

Scout is a provider of pharmacy benefit consulting services. (ECF No. 1-2, PageID.21).   Scout's President, Richard Vanpraet, founded the company in 2019 with the purpose to lower drug costs for self-funded employer benefit groups. (ECF No. 21-3, PageID.453–54).   The company achieves its purpose through its "Core Strategies" services. (ECF No. 1-2, PageID.21–22).   The "Core Strategies" services consist of a series of programs generally defined as follows.   Under the "specialty" program, Scout advocated for plan members to receive Patient Assistance Plans (PAPs) from drug manufacturers. (ECF No. 21-3, PageID.464).   If a member qualified for a PAP, the drug manufacturer would provide the drug for free or at a substantial discount. (*Id.* at PageID.474–75).   The "co-pay optimization" program

2

involved the use of coupons to save the group money. (*Id.* at PageID.464). And the "international" program focused on procuring drugs from international suppliers. (*Id.* at PageID.465).

ProAct is a pharmacy benefits manager. (ECF No. 21-2, PageID.297–98). David Schryver serves as the company's president and held this role during the events at issue. (*Id.* at PageID.297). ProAct's relationship with Scout formally began on January 1, 2020, when the parties entered into a service agreement for ProAct to provide Scout pharmacy benefit management (PBM) services. (*Id.*; ECF No. 21-5, PageID.758). As the pharmacy benefits manager for Scout, ProAct helped Scout administer its program by managing tasks such as claims processing and planning bills and rebates. (ECF No. 21-2, PageID.297). The parties renewed the service agreement in January 2022. (ECF No. 21-6, PageID.794).

Sometime after the service agreement initially took effect, ProAct began contemplating an expansion of its own service offerings to include a service along the lines of what Scout offered, that is, lowering specialty drug costs for groups. (ECF No. 21-2, PageID.298–99). Because of the parties' pre-existing relationship, and because Scout had expertise in this area, ProAct believed a partnership between the two to establish ProAct's own program would be "synergistic." (*Id.* at PageID.299). Discussions between ProAct and Scout about the potential program commenced between late 2020 and early 2021. (*Id.* at PageID.298). At an in-person

3

meeting in April 2021, referred to as "the Summit," representatives of ProAct and Scout discussed how such a program would work. (ECF No. 21-3, PageID.505–07). Attendees included Vanpraet from Scout and ProAct's Director of Account Management, David Mastrangelo, among others. (*Id.* at PageID.505).

Scout's meeting minutes from the Summit outline what the parties discussed, namely, how the program would function. (ECF No. 21-7, PageID.831). The minutes explain comprehensively which party would be responsible for what and how the parties would be compensated. (*Id.*). Although Scout would not be the exclusive service provider, it would be "the only internal white label option." (*Id.* at PageID.832). "White label" refers to when a company provides services to another company and that company represents and sells the service as its own to the market. (ECF No. 21-4, PageID.672). In practice, ProAct would sell its service to a group, but Scout would primarily provide the service. (*Id.* at 673).

In addition, the parties agreed that groups joining the program would be charged a fee equal to 25% of the drug cost savings realized; ProAct and Scout would split the fee according to the group size, with the range of revenue ProAct was entitled to varying between 25-35%. (ECF No. 21-7, PageID.832). The meeting minutes did not mention what would happen in the event either party decided to terminate the arrangement.

4

Scout indicated at the Summit that "if ProAct came onboard, ScoutRx will slow down our company sales to make sure we can accommodate the business that [ProAct] steer[s] to [Scout]." (ECF No. 23-5, PageID.1236).   In fact, Vanpraet informed ProAct's representatives that it had "no problem turning away business from our internal sales perspective to ensure a long term growth strategy and partnership with ProAct." (*Id.*).   Overall, the parties were enthusiastic and hopeful that the program would takeoff and succeed. (ECF No. 21-4, PageID.680–81).

On May 3, 2021, Vanpraet reached out to Mastrangelo for his thoughts on a Master Services Agreement (MSA) for the intended arrangement. (ECF No. 21-8, PageID.834).   This was not the first mention of a potential MSA; the meeting minutes provided that "ScoutRx prefers an MSA will be developed to specifically address this joint venture." (ECF No. 21-7, PageID.832).   Mastrangelo replied in agreement to Vanpraet's email, and Vanpraet responded that he had tried "to change a couple of our contracts into something that would fit our arrangement" but it could not be done. (ECF No. 21-10, Page.844).   Instead, the parties would have to build out something new. (*Id.*).   Mastrangelo forwarded Vanpraet's emails to Schryver. (*Id.* at PageID.843).   On May 7, Mastrangelo informed Vanpraet that the parties could pull plans for "duties and finances" from the meeting minutes but that he would need more information. (ECF No. 21-12, PageID.910).   Vanpraet replied he would work

5

on it the following Monday. (*Id.*).  Discussions about the MSA, however, tapered off in the lead-up to the program launch.

The parties labeled the program "ProActPlus." (ECF No. 23-7, PageID.1240). In the lead up to its launch, Scout and ProAct worked together to draft a policy and procedure statement outlining the parties' respective responsibilities. (ECF No. 21-13, PageID.916; ECF No. 21-2, PageID.303).  The statement did not mention what would happen in the event either party terminated the business relationship.  Instead, it described how ProAct would market ProActPlus and source new and existing clients, compile a profile on prospective clients that it would send to Scout for Scout to project cost savings, and prepare a written proposal based on Scout's projections. (ECF No. 21-13).  If the client accepted the proposal, it would contract with ProAct but would be sent to Scout for the services, and Scout would invoice ProAct for its services. (ECF No. 21-2, PageID.308–10).

The parties officially launched ProActPlus on August 1, 2021. (ECF No. 21-3, PageID.526).  In addition to existing clients, Schryver reported that five new groups were coming on board between August 3, 2021 and January 1, 2022 and that the ProActPlus was "paying off!" (ECF No. 23-9, PageID.1244).  As of kickoff, though, the parties had still not entered into an MSA to govern the relationship.

On August 6, 2021, Vanpraet sent Schryver a copy of Scout's "Pharmacy Benefit Consultant Agreement" (PBCA) as "potential contract language" for ProActPlus. (ECF No. 21-14, PageID.927).  As relevant to the current motion, the PBCA contained a provision that stated:

> [i]f the Organization leaves the Pharmacy Benefit Consultant for any reason and continues to recognize savings . . . on specialty drugs due to Pharmacy Benefit Consultant's services under this Agreement, the specialty core strategy program compensation will continue for the two-year duration from the first fill of the specialty drug that occurs during the term of this Agreement or when the member stops taking the specialty drug, whichever comes first.

(ECF No. 23-11, PageID.1250).  Schryver replied that he would review the PBCA and would get back to Vanpraet. (ECF No. 21-15, PageID.948).  But ProAct never signed nor agreed that the PBCA would govern the ProActPlus program. (ECF No. 21-3, PageID.531).

ProActPlus grew significantly within the first five months of its operation. (ECF No. 21-2, PageID.318).  On January 10, 2022, Mastrangelo sent Scout representatives its growth projections so that the parties could "budget resources and sales activities." (ECF No. 23-12, PageID.1268).  But according to ProAct, the parties began to diverge shortly thereafter. (ECF No. 21, PageID.269).  For example, on January 13, 2022, ProAct indicated its intention to offer a fee discount to a significant prospective customer, the Montana Municipal Interlocal Authority

7

(MMIA), that Scout refused. (ECF No. 21-2, PageID.320–21; ECF No. 23-16, PageID.1277).

The relationship continued to sour. (ECF No. 21, PageID.269). ProAct believed Scout's billings differed from its proposals and amounted to a "bait and switch." (ECF No. 21-16, PageID.953). Schryver prepared and sent draft MSAs; Vanpraet testified these were not prepared in good faith. (ECF No. 21-3, PageID.557–58). According to Vanpraet, the draft MSAs gave ProAct ownership over all that Scout contributed to ProActPlus and adjusted the compensation ProAct received to higher than what the parties were currently doing. (*Id.* at PageID.558). No progress on an MSA occurred despite Vanpraet and Schryver sending emails on the subject through July 2022. (ECF No. 21-19). During his deposition, Vanpraet referred to the last-in-time version of the draft MSA that Schryver sent on July 1, 2022 as a "middle finger solute" and that it was clear that ProAct was "done with [Scout]." (ECF No. 21-3, PageID.557–58).

Even though the parties continued to discuss an MSA up until July, ProAct claimed that it realized sometime in March 2022 that it had no choice but to bring the ProActPlus program fully in-house or replace Scout. (ECF No. 21-2, PageID.354; ECF No. 23-19, PageID.1284). Scout argued the facts show that ProAct plotted to internalize Scout's services long before that. (ECF No. 23, PageID.1026). In its response to ProAct's motion, Scout alleged ProAct's "plan

from the beginning was to learn everything about Scout's program and 'internalize' it for their own financial gain without advising Scout." (*Id.*).   It presented the following evidence to support its theory.

First, and as early as October 2021, Schryver wrote that he "left the door open for a year" for ProAct to seemingly "fire up [its] own" version of Scout's business. (ECF No. 23-15, PageID.1274).  Second, on January 13, 2022, around the same time the dispute over MMIA materialized, Schryver emailed the ProAct team asking if ProAct could do what Scout did for MMIA by July 1 "without Scout." (ECF No. 23-16, PageID.1277).   ProAct's Chief Control Officer wrote on January 14, 2022 that ProAct should "strategize on how to concurrently figure out how to do it ourselves in the next 90-120 days." (ECF No. 23-17, PageID.1279).  Schryver replied: "There is a lot of money in this space if we can figure this out…" (*Id.*).   The ProAct recipients on the thread then jokingly discussed poaching Scout's team members. (*Id.*).

Third, by March 2022, Schryver had begun outlining plans to internalize Scout's services and pull business back from Scout, which primarily involved hiring and training two in-house employees to do what Scout did. (ECF No. 23-18, PageID.1281).  Later that same month, ProAct realized it could "get away with one" new employee based on a "new relationship that [ProAct has] with an external partner that will be doing this for [ProAct]." (ECF No. 23-19, PageID.1284).  In fact,

9

ProAct lent $200,000 to that external partner, CoPayAssistRx, to help the company get up and running so it could support ProAct's business. (ECF No. 21-2, PageID.367–68; ECF No. 23-24, PageID.1295).   By working with CoPayAssistRx instead of Scout, ProAct would receive 75% of the revenue, a percentage significantly higher than the 30% it received from its relationship with Scout. (*Id.* at PageID.375).

Fourth, the plan to transition out of Scout had solidified by June 2022 as indicated by a ProAct representative sending Schryver an email noting that she had "left November clear since we plan to transition the ScoutRx block over at that time." (ECF No. 23-20, PageID.1286).   Fifth, when Vanpraet asked ProAct about existing clients being anxious to move forward, ProAct employees, including Mastrangelo, internally discussed Vanpraet being "hot on our tracks." (ECF No. 23-21, PageID.1288).   Likewise, after Vanpraet informed Mastrangelo that two clients were terminating the ProActPlus program, Mastrangelo forwarded the email to Schryver and wrote:

> That strategy may have bit us in the butt. Should we just tell him that we are handling this. Or go as far as telling him they are NOT terming [sic] and we are migrating to our program outside of the ScoutRx backing. Either way I feel we are reaching the tipping point in the relationship.

(ECF No. 23-22, PageID.1290).

On July 22, 2022, days after this email exchange, Vanpraet and Mastrangelo had a conversation. (ECF No. 23-23, PageID.1292).  At this point it became clear that ProAct did not intend to move forward with the relationship. (*Id.*).  On July 25, 2022, Vanpraet sent a "list of expectations" for the transition as a way to protect the business interests of both companies. (*Id.* at PageID.1292–93).

As relevant to the parties' current dispute, the list included that "Scout Rx will continue to service the established PAP members until two years from the original fill month" and that "Scout Rx will continue to send out a monthly bill to ProAct for established PAP up to two years from original fill or until the member ceases to take the medication." (*Id.* at PageID.1292).  Scout also proposed that ProAct could "pay out up to two years all at once and Scout Rx would go away all at once for groups transitioning." (*Id.* at PageID.1293).  The idea that Scout would continue to service and bill for established PAP members for two years from the original fill month largely mirrored the provision in the PCBA. *See supra* p. 7–9; *see also* ECF No. 23-11, PageID.1250.  The Court will refer to Scout's two-year termination payment proposal as the "Termination Payment."

Although Mastrangelo responded that Vanpraet's July 25 proposal was "fair," (ECF No. 23-23, PageID.1292), ProAct ultimately terminated its arrangement with Scout via letter on September 30, 2022, effective on November 1, 2022. (ECF No. 21-24, PageID.1007).  ProAct stated it would not compensate Scout for services

11

beyond the expiration of PAP enrollments under ProActPlus, and ProAct expected these PAP enrollments to expire on December 31, 2022. (*Id.* at PageID.1008). The letter made clear that ProAct would not abide by Scout's proposed Termination Payment. As this all occurred, ProAct onboarded CoPayAssistRx to handle Scout's functions, infused it with more funding, and ultimately reported a significant revenue increase, from $700,000 per year to $1,900,000 per year, as a result. (ECF No. 21-2, PageID.370; ECF No. 23-24, PageID.1295; ECF No. 23-25, PageID.1297; ECF No. 23-26, PageID.1300).

Scout initiated this lawsuit in state court in July 2023. (ECF No. 1-2, PageID.20). ProAct removed the case on the basis of diversity jurisdiction. (ECF No. 1). In the present motion, ProAct argued that the facts indisputably show the parties never agreed to a Termination Payment like the one Scout proposed. (ECF No. 21, PageID.272–73). ProAct also asserted that it never had a scheme to improperly learn and internalize Scout's cost-saving strategies. (ECF No. 24, PageID.1315). ProAct asked the Court to grant summary judgment on all of Scout's claims.

Scout responded that material issues of fact existed as to whether the Termination Payment was applicable to the parties' agreement, and whether ProAct misled Scout into sharing its business information so that it could steal it for its own and reap the financial rewards. (ECF No. 23, PageID.1035, 1038–40). Thus, its

12

claims should survive summary judgment.  The Court will address each of Scout's claims below.

## II.    Legal Standard

A court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the movant meets its burden under Rule 56(a), the non-moving party "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  A genuine issue for trial exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But if the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita*, 475 U.S. at 587, then summary judgment is appropriate.

Put another way, the court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire and Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (citation omitted).  A party may move for summary judgment on any claim or defense asserted. *See* Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, a court must draw all reasonable

inferences in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587–88; *see also Craig v. Bridge Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) ("[A]t this stage of litigation, 'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'") (quoting *Anderson*, 477 U.S. at 255)).

## III.   Analysis

For the reasons stated below, the Court will grant summary judgment for ProAct on all of Scout's claims, with the exception of Scout's quantum meruit/unjust enrichment claim.

### A.   Breach of Contract

Because the parties never agreed to the Termination Payment, the Court will grant summary judgment on Scout's breach of contract claim.

"Before a contract can be completed, there must be an offer and acceptance." *Clark v. Al-Amin*, 309 Mich. App. 387, 394 (2015) (citation omitted); *see also Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 549 (1992) ("A contract is made when both parties have executed or accepted it, and not before."). Acceptance "sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian v. Domino's Pizza L.L.C.*, 273

Mich. App. 449, 453–54 (2006) (citation omitted).  An enforceable contract requires that acceptance be "unambiguous and in strict conformance with the offer." *Id.* (citation omitted).

Further, "[a] valid contract requires mutual assent on all essential terms." *Eerdmans v. Maki*, 226 Mich. App. 360, 364 (1997); *see also Hess v. Cannon Tp.*, 265 Mich. App. 582, 592 (2005) (listing "mutuality of agreement" as an "essential element[] of a valid contract") (quoting *Thomas v. Leja*, 187 Mich. App. 418, 422 (1991)).  Otherwise referred to as a "meeting of the minds," mutual assent is "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective state of mind." *Global Fleet Sales, LLC v. Delunas*, 203 F. Supp. 3d 789, 817 (E.D. Mich. 2016) (quoting *Stanton v. Dachille*, 186 Mich. App. 247, 256 (1990)).  Ultimately, "[m]ere discussions and negotiation cannot be a substitute for the formal requirements of a contract." *Eerdmans*, 226 Mich. App. at 364.

Here, the parties never entered a written contract governing their agreement. Although they had discussions about preparing an MSA, they instead relied on what they had agreed to orally for the duration of their working relationship.  ProAct stated that the parties operated ProActPlus consistent with their oral agreement, (ECF No. 21, PageID.274), and Scout's counsel did not dispute this at the hearing.  But ProAct argued that the oral agreement did not include the Termination Payment, and that

ProAct never consented to such a payment. (*Id.*).  As a result, no breach occurred. (*Id.* at 272–74).  The Court agrees.

Scout pointed to two pieces of evidence to support its argument that the contract between the parties included the Termination Payment.  First, the parties allegedly adopted the PBCA when Scout sent it to ProAct to consider as a template for an MSA because ProAct continued to use Scout's services thereafter. (ECF No. 23, PageID.1035–37).  Second, when Mastrangelo responded "I believe what you're proposing is fair" to Vanpraet's email setting forth Scout's expectations for the parties' transition out of working together, which included the Termination Payment, (ECF No. 23-23, PageID.1292), this rendered the Termination Payment enforceable. (ECF No. 23, PageID.1038–39).

As to the first piece of evidence, there is no proof that ProAct mutually assented to the PCBA's terms or returned an executed version.  Instead, the record shows that the PBCA was clearly intended as a template for a potential MSA.  ProAct never signed and returned the PBCA nor indicated that the template agreement would govern ProActPlus. (ECF No. 21-3, PageID.531).  All that ProAct's President Schryver replied was "Sounds good. Let me review this for the client side and get back to you." (ECF No. 21-15, PageID.948).  Schryver's response is far from the unambiguous acceptance required for an enforceable contract.  Scout also sent ProAct the PBCA template after the ProActPlus program began. (ECF No. 21-14,

PageID.927).   Thus, it is unlikely that ProAct performed in accordance with the PBCA or used Scout's services with the expectation that it was bound by the terms of the PBCA.

Scout relied on *Ludowici-Celdaon Co. v. McKinley*, 307 Mich. 149 (1943) for the proposition that acceptance may be implied from the parties' acts. (ECF No. 23, PageID.1036).   The facts in *McKinley* involved whether the seller was entitled to full performance of the contract based on the terms the buyer proposed that the seller accepted via order fulfillment. *Id.* at 152.   Both parties were fully aware of the expectations set forth by their agreement. *Id.* at 153–54.   The seller needed to deliver the number of tiles the buyer ordered, and the buyer needed to pay the seller for the tiles upon delivery. *Id.* at 154–55.   At issue was whether the buyer could reject some of the tiles it ordered and not pay the seller; the court said no. *Id.*

Unlike the situation in *McKinley*, ProAct never accepted the Termination Payment either explicitly or implicitly.   The evidence does not show a material dispute of fact as to this point.   Scout sent a template that contained the Termination Payment, but ProAct never consented to its use as an MSA.   Up until the relationship broke down, the parties performed according to their expectations.   Thus, because ProAct never agreed that the PBCA would govern the relationship, Scout cannot claim it is entitled to the Termination Payment on these grounds.

Turning to the second piece of evidence, Mastrangelo's response does not constitute acceptance of the Termination Payment.  Mastrangelo replied that the proposals seemed fair, not that ProAct would implement them.  The Court cannot read Mastrangelo's reply as acceptance.  Thus, without proof of mutual assent or acceptance, Scout's breach of contract claim cannot survive. *See Benson v. Dep't of Mgmt. and Budget*, 168 Mich. App. 302, 306–07 (1988) (denying breach of contract claim as the plaintiff presented no proof that defendant "expressly agreed to undertake the obligation" that formed the basis of the claim).

The record shows no evidence to support that the parties incorporated the Termination Payment as part of their oral agreement.  Beyond the two pieces of evidence the Court addressed, there is no reference to the Termination Payment in the meeting minutes that reflected the contours of the relationship, the policy and procedure statement, or any correspondence cited to by the parties.  No reasonable juror could find, then, that Scout's breach of contract claim has merit.  Therefore, the Court will grant summary judgment for ProAct on this claim.

### B.    Quantum Meruit/Unjust Enrichment

Although Scout's breach of contract claim fails, Scout still has a cognizable claim for unjust enrichment.  Given that the parties' oral agreement did not contemplate what would occur in the event of termination, a reasonable juror could conclude that ProAct retained an inequitable benefit from seemingly poaching

18

Scout's business model.  The Court will deny summary judgment for ProAct on this claim.

To start, ProAct argued that Scout's quantum meruit and unjust enrichment claims cannot survive summary judgment when the facts underlying the equitable theories are the same as those offered to support the breach of contract claim. (ECF No. 21, PageID.278).  Scout replied that because ProAct had the ability to learn "every nuance" of Scout's business, such that it could later internalize Scout's services and thereby triple its revenue, ProAct was unjustly enriched. (ECF No. 23, PageID.1039–40).

"[C]laims for unjust enrichment and quantum meruit have historically been treated in a similar manner." *NL Ventures VI Farmington, LLC v. City of Livonia*, 314 Mich. App. 222, 241 (2015); *see also Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 195 (2006).  "The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment . . . " *NL Ventures*, 314 Mich. App. at 241 (quoting *Morris Pumps*, 273 Mich. App. at 194).  To establish an unjust enrichment claim, a party must demonstrate: "(1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *NL Ventures*, 314 Mich. App. at 241 (citation omitted).  A party is only liable if receiving or retaining the benefit is unjust. *Id.*

19

"For quantum meruit and unjust enrichment to apply, there must not be an express contract between the parties covering the same subject matter." *Meisner Law Grp. PC v. Weston Downs Condo. Assoc.*, 321 Mich. App. 702, 726 (2017). But the rule that the existence of an express contract prevents equitable recovery does not apply in cases where the recovery sought is for "items not contemplated in the original contract." *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426 (1976).

Contrary to ProAct's argument, the Court does not read the case law to mean that Scout's breach of contract claim forecloses its unjust enrichment and quantum meruit claims. Instead, the record is devoid of evidence that Scout and ProAct explicitly considered what the parties would do in the event of termination from the time the ProActPlus program began up until Vanpraet's July 25, 2022 email. As a result, the oral agreement clearly did not cover the subject matter of the present dispute, that is, whether Scout is owed anything from ProAct's decision to terminate.

Unlike cases where a court found that the contract featured the subject matter of the litigation, there is no reference to a termination payment or termination generally in the meeting minutes or the policy and procedure statement, the two key indicators of how ProActPlus operated. *Contra Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717, 730 (6th Cir. 2006) (finding unjust enrichment claim impermissible when the contract "clearly covered the subject matter of the litigation, namely, the proper amount that [plaintiff] should have paid [defendant]"); *Belle Isle*

*Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 479 (2003) (finding that because lease "expressly contemplated and covered capital improvements in lieu of rent" the plaintiff could not recover the costs of improvement by an implied contract). As a matter of law, then, Scout's unjust enrichment claim is allowed to proceed.

In addition, a reasonable juror could find that ProAct was unjustly enriched at Scout's expense. The facts suggest that ProAct entered into an arrangement with Scout so that it could learn about and internalize Scout's business model. *See supra* pp. 9–10. Correspondence shows that ProAct planned to hire employees to handle Scout's services, and eventually looped in a new business partner, CoPayAssistRx. (ECF No. 23-18, PageID.1281; ECF No. 23-19, PageID.1284). And glaringly, ProAct helped CoPayAssistRx, a start-up competitor to Scout, get off the ground by providing it with hundreds of thousands worth of funding, (ECF No. 21-2, PageID.367–68, 370), and later transitioned its clients with Scout to that platform at a much more favorable revenue rate. (ECF No. 23-25, PageID.1297). The switch led ProAct to triple its revenue. (ECF No. 23-26, PageID.1300). Because a material dispute of fact exists, then, such that a jury could hold ProAct liable for its decision to discard Scout once it internalized Scout's strategies and propped up an external partner willing to take on Scout's responsibilities, the Court will deny summary judgment on this claim.

## C.    Equitable Estoppel

The Court will grant summary judgment in favor of ProAct on Scout's claim for equitable estoppel.  Counsel for Scout conceded at oral argument that this claim likely lacked merit because equitable estoppel is not an independent cause of action.  Counsel is correct.  "Equitable estoppel is not an independent cause of action, but instead a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact." *See New Prods. Corp. v. Harbor Shores BHBT Land Dev., LLC*, 331 Mich. App. 614, 627–28 (2019) (citation omitted); *see also Hoye v. Westfield Ins. Co.*, 194 Mich. App. 696, 704 (1992) ("[E]quitable estoppel is a doctrine, not a cause of action.").  Thus, Scout's equitable estoppel count fails as a matter of law.

The Court also finds that Scout abandoned its request for equitable estoppel in its response to ProAct's motion for summary judgment.  The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in a response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013).  Because Scout failed to acknowledge ProAct's argument as to equitable estoppel, or point to any facts to support its claim, Scout effectively waived this count. *See Lisan v. Wilkie*, 835 Fed. App'x 831, 834–35 (6th Cir. 2011).  The Court

will therefore grant summary judgment for ProAct on Scout's equitable estoppel claim.

### D.    Promissory Estoppel

The Court will also grant summary judgment for ProAct on Scout's promissory estoppel claim.  According to Scout, ProAct clearly, definitively, and unequivocally induced Scout to provide services under the ProActPlus program because it represented that the Termination Payment applied to the relationship. (ECF No. 1-2, PageID.26–27).   That is, when Scout sent ProAct the PCBA containing the Termination Payment, or when Mastrangelo called the termination proposal, with the Termination Payment, "fair," ProAct in effect promised that it would abide by the Termination Payment's terms. (ECF No. 23, PageID.1042).

"[P]romissory estoppel is an alternative theory of recovery where no contract exists; and, thus, it is a substitute for consideration." *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993).  The elements consist of:

> (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisor, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided.

*Milford Hills Props., Inc. v. Charter Twp. of Milford*, Nos. 353249, 353489, 2021 WL 4005866, at *6 (Mich. App. Sept. 2, 2021) (citation omitted).  Courts apply the

doctrine "cautiously" and "only where the facts are unquestionable and the wrong to be prevented undoubted." *Id.* at *7.  It is reserved for "situations that approach, but do not perfectly achieve, contract formation." *Id.*

Here, no issue of material fact exists as to the elements of promissory estoppel and ProAct is entitled to summary judgment.  The evidence is insufficient to show that ProAct promised the Termination Payment applied.  The Court does not find that email exchange regarding the PBCA, and the July 25, 2022 Mastrangelo email, contain any language forming a promise.  And the Court will not imply a promise where none exists.  For these reasons, the Court will grant summary judgment in favor of ProAct on Scout's promissory estoppel claim.

### E.    Fraud

Scout alleged claims for fraudulent misrepresentation and fraud in the inducement based on ProAct's representation that the Termination Payment applied to the parties' business relationship. (ECF No. 1-2, PageID.27–30).  In Michigan, fraud "must be established by clear and convincing evidence and must never be presumed." *Deschane v. Klug*, 344 Mich. App. 744, 750 (2022) (citation omitted).  Fraudulent misrepresentation and fraud in the inducement are variants of common law fraud.

"[F]raudulent misrepresentation entails a defendant making a false representation of material fact with the intention that the plaintiff would rely on it."

*Alfieri v. Bertorelli*, 295 Mich. App. 189, 193 (2012).  In addition, the defendant must either know at the time that the representation was false or make it with reckless disregard for its truth.  *Id.*  Finally, the plaintiff must actually rely on the representation and suffer damage as a result.  *Id.*  "The absence of any one of these elements is fatal to a recovery."  *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 784 (E.D. Mich. 2014) (citation omitted).  To note, a future promise cannot form the basis of an action for fraudulent misrepresentation because the fraudulent statements must relate to past or existing facts.  *Deschane*, 344 Mich. App. at 750–51.

To establish fraudulent inducement, a plaintiff must establish elements identical to those of fraudulent misrepresentation.  The elements include:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Custom Data Sols., Inc. v. Preferred Cap., Inc.*, 274 Mich. App. 239, 243 (2006).  Fraudulent inducement occurs when a party materially misrepresents future conduct under circumstances where it is expected another party will rely on the misrepresentation.  *Id.* at 242–43.  The doctrine is designed to redress

"misrepresentations that induce the buyer to enter into a contract but that do not in themselves constitute contract or warranty terms subsequently breached by the seller." *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 375 (1995). That is, it "addresses a situation where the claim is that one party was tricked into contracting." *Llewellyn-Jones*, 22 F. Supp. 3d at 778 (quoting *Huron*, 209 Mich. App. at 371)).

In cases involving fraud claims, courts interpret Michigan law to require that a plaintiff's reliance be reasonable. *See MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 662–63 (6th Cir. 2013) ("[P]laintiffs' reliance on the alleged misrepresentation must have been reasonable."); *see also DBD Kazoo LLC v. W. Mich. LLC*, No. 361299, 2024 WL 500208, at *7 (Mich. App. Feb. 8, 2024) ("Both fraud and misrepresentation claims, however, require proof of reasonable reliance on a false representation.").

Here, no reasonable juror could find that the facts support either fraud-based claim. ProAct never made any representation that the Termination Payment applied to its arrangement with Scout that Scout could reasonably rely on to its detriment. Scout argued that the "representations made by Schryver and Mastrangelo" supported its fraud claim. (ECF No. 23, PageID.1041). Namely, Mastrangelo's alleged representation that Scout's termination proposals were "fair," and that Scout relied on this representation, merited trial. (*Id.*). But Scout presented insufficient

26

evidence that ProAct (1) made a representation that (2) Scout reasonably relied on, both necessary elements of fraud.

To begin, the Termination Payment first came up when Scout sent ProAct the PBCA as "potential contract language" on August 6, 2021, (ECF No. 23-10, PageID.1246), *after* the parties began their business arrangement. *See Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 688 (1999). Because the ProActPlus program launched on August 1, Scout could not have reasonably relied on the Termination Payment as a basis to enter into the arrangement, thereby undermining its fraudulent inducement claim. Next, and critically, ProAct never represented that the Termination Payment applied. In fact, the two instances where the Termination Payment was referenced show that it was never directly addressed by ProAct. The two instances include (1) Scout sending ProAct the PCBA with the Termination Payment language and (2) the July 25, 2022 Mastrangelo email calling Scout's termination proposals, including the Termination Payment, "fair." (ECF No. 23, PageID.1041). As discussed at length in the previous sections, ProAct never assented to the Termination Payment or agreed to be bound by its terms. Without such a representation, Scout could not have reasonably relied on the Termination Payment in agreeing to provide the services under the ProActPlus program; as a result, no juror could conclude that Scout satisfied the reliance element of fraud. The Court, therefore, will grant summary judgment on both of Scout's fraud claims.

27

### F.      Declaratory Judgment

Scout's request for declaratory judgment restates its breach of contract claim.[1] That is, it sets forth the same elements required to prove breach of contract and asks the Court to declare each one in Scout's favor.  The request culminates in Scout asking the Court to declare that ProAct must pay the Termination Payment. (ECF No. 1-2, PageID.30–31).

District courts have discretion to enter declaratory judgment. *Allstate Ins. Co. v. Hayes*, 442 Mich. 56, 74 (1993).  "[I]n exercising its discretion, the court must keep in mind the purposes to be served by a declaration of rights." *Id.*  Here, the request for declaratory judgment is duplicative of Scout's breach of contract claim. And Scout's breach of contract claim is the more appropriate avenue for relief, considering the termination already occurred and the harm has materialized. *See Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 847 (E.D. Mich. 2003).  Finally, because the Court already granted summary judgment for ProAct on Scout's breach of contract claim, there is no reason to consider the

---

[1] Scout requested declaratory relief under MCR 2.605. (ECF No. 1-2, PageID.30). But because ProAct removed the case to federal court, federal law governs Scout's request for declaratory relief.  The applicable federal statute, 28 U.S.C. § 2201, is largely analogous to MCR 2.605.  As a result, the outcome is the same under both.

same allegations repackaged as a declaratory judgment request.  For these reasons, the Court will grant summary judgment in favor of ProAct.

### G.    Injunctive Relief

Scout offered no facts to support its request for injunctive relief in its complaint. (ECF No. 1-2, PageID.31–32).   Instead, it merely recited the legal elements of an injunctive relief claim. (*Id.*).  Nor did Scout rebut ProAct's argument for summary judgment.  By failing to connect any facts to its claim, or even identify what the injunction would address, no reasonable juror could find in favor of Scout on its request.  Moreover, Scout did not even mention its injunctive relief request in its response to ProAct's motion, effectively abandoning its request.

In addition, injunctive relief is "a remedy, not a cause of action." *Edwards v. J.P. Morgan Chase Bank, N.A.*, No. 12-cv-15204, 2013 WL 1632560, at *2 (E.D. Mich. Apr. 16, 2013).  Thus, because an injunction is not a stand-alone cause of action, and because Scout's request is untethered from its other claims and the facts, the Court will grant summary judgment for ProAct on this request.

\* \* \*

For the reasons given, the Court **ORDERS** that the motion for summary judgment (ECF No. 21) is **GRANTED IN PART AND DENIED IN PART**.

Dated: May 9, 2025                        s/Robert J. White
                                          Robert J. White
                                          United States District Judge